Filed 7/31/24  In re Victoria T. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re Victoria T., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E082637 |
| Plaintiff and Respondent, | (Super.Ct.No. J295613) |
| v. | OPINION |
| KEVIN T., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Cara D. Hutson, Judge.  Affirmed.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Pamela J. Walls, Special Counsel, and Tom Bunton, County Counsel, for Plaintiff and Respondent.

1

Kevin T. (Father) appeals from the juvenile court's orders terminating dependency jurisdiction and granting Vanessa D. (Mother) sole physical and sole legal custody of their daughter, Victoria. He argues that the court should have ordered joint custody, and in the alternative he argues that the court abused its discretion by ordering that his visitation with Victoria remain supervised. We disagree and affirm.

BACKGROUND

I. *Detention*

In January 2023, Father called local law enforcement to paternal grandparents' home, alleging that they were influencing seven-year-old Victoria to act out against him. He did not want paternal grandparents to have any contact with Victoria. When law enforcement arrived at the home, Victoria asked that they arrest Father for "emotional abuse." Law enforcement arrested Father for child abuse and obstruction.

When interviewed by the San Bernardino County Department of Child and Family Services (CFS), Victoria reported that she lived with Father in paternal grandparents' home. She explained that she and paternal grandmother were close and that she missed paternal grandmother. Victoria described Father's controlling behavior and how he refused to allow her out of his presence, including when he slept and went to the bathroom. She said that he would slap her in the face with an open hand and hit her with a closed fist to discipline her. Victoria and paternal grandparents were afraid of Father, and Victoria was "pleased" that law enforcement had arrested Father and that Mother was going to care for her.

2

When CFS spoke to Father, he denied physically abusing or "demeaning" Victoria, and he denied using any physical discipline. He also denied that he had locked Victoria anywhere within the home alone and admitted to locking the bedroom door while Victoria was with him to prevent paternal grandmother from "'barging into [his] room and creating trouble.'" He reported that based on Victoria's therapist's recommendation, he brings Victoria with him to the bathroom instead of leaving her unattended, and he said that he keeps his body covered while doing so. Father also stated that he wanted to raise his children right and admitted that he would fight with paternal grandparents and call law enforcement to maintain peace. He felt that CFS's involvement was due to his mother's false reports.

Victoria was placed in Mother's care. Mother reported that she had attempted to contact Father but never received any response and that most of her communication was through paternal grandparents. Mother feared Father and was concerned for Victoria and paternal grandparents. Mother was already enrolled in private services, had been sober for one and one-half years, and was excited to care for Victoria.

Paternal grandmother was frightened of Father too, and she was concerned with checking her doorbell camera while CFS interviewed her. She wanted to obtain a restraining order against Father and wanted him to move out, reporting that she was "tired of being a hostage in her own home." Paternal grandfather reported that Father had assaulted him in the past and that he was worried about paternal grandmother.

3

CFS filed a petition under Welfare and Institutions Code section 300, alleging that Father slapped and punched Victoria, that he had "suspected substance abuse" and "mental health issues," that he failed to provide for Victoria's needs, and that he engaged in domestic violence with paternal grandparents. The petition also alleged that Mother should have known that Father was engaged in domestic violence and that Father had caused Victoria "serious emotional damage" by holding her hostage and verbally abusing her.

At the detention hearing in January 2023, Mother stated that she had lived with Father from 2014 to January 2016, that Victoria was born in 2015, and that Victoria had lived with Father since July 2022 under custody orders. Father mostly agreed and stated that Victoria had been living with him since 2020. The juvenile court detained Victoria from Father, released her to Mother, ordered supervised visitation for Father, and ordered visitation for paternal grandparents. The court further ordered predispositional services for both parents.

II.     *Jurisdiction and disposition*

In its jurisdiction and disposition report, CFS reported that Father denied the allegations in the petition when interviewed again following the detention hearing. He said that paternal grandmother had influenced Victoria to falsely accuse him of hitting Victoria, and he questioned the authority for his recent arrest, stating that he entered the home while law enforcement was present because he was concerned about paternal grandmother's presence during Victoria's interview. He reported that he had participated

4

in mental health services following his separation from Mother and denied having posttraumatic stress disorder (PTSD) from his military service. Father denied that any domestic violence occurred with the paternal grandparents, and he reported that he had called law enforcement on them approximately 15 times for "interfering with his parenting practices."

Father reported that he was arrested for domestic violence involving Mother in 2015 and 2016. He also reported that he had a physical altercation with paternal grandfather, which Victoria had witnessed. He acknowledged that there were issues with his living situation and explained that he could not yet move out of paternal grandparents' home. Father reported that Victoria had issues with lying and stealing and that she had developed mental health issues while in Mother's care. He said that he had Victoria in counseling at her last school and had initiated an individualized education program for her, which addressed her behavioral issues. He denied using physical discipline for his children and stated that it is natural for children to fear their parent.

Victoria was also interviewed that day. She felt safe and happy in Mother's home. She stated that Father would punch her on the back to discipline her, but she denied that he slapped her in the face. She said that Father last hit her approximately one year ago. She also said that Father sometimes initiates arguments with paternal grandparents and calls law enforcement. She denied that the arguments had turned physical lately, and she stated that fights had been physical in the past. She thought that Father's residence was a "happy, sad, and mad home."

Victoria's paternal half-brother, Antonio, reported being afraid of Father. Antonio said that Father pulled his hair and hit him on the "bottom" approximately two years ago, and Antonio reported that he had "sustained a bruise on his eye from [Father] throwing a cup." He also witnessed Father hit Victoria on her "bottom" and push her "out of the way."

Mother was interviewed again in late January 2023. She thought that Victoria had attention deficit hyperactivity disorder and had a problem with lying. She also thought that Father had undiagnosed mental health issues, and she reported that Father had admitted suffering from PTSD. Mother reported that Father was a good father during his relationship with Mother and had been unemployed since he lost his job as a police officer because of his history of domestic violence.

Pending the contested jurisdiction and disposition hearings, Father enrolled in services, including a domestic violence program, parenting classes, and individual therapy. He requested a different therapist because he felt that the referred provider did not have his best interests in mind.

Father's visits with Victoria were supervised by CFS at its regional office. At their first visit in February 2023, Victoria and Father were not communicating and remained silent until Victoria confronted Father about the issues that led to the dependency case. Father requested that visits be suspended until the next hearing and felt that Victoria was being influenced by Mother, but the visits remained consistent nonetheless.

6

In March 2023, Mother brought Victoria to a visit 10 minutes late. Victoria initially did not want to see Father, but she "quickly agreed." The social worker added extra time to the visit to account for Mother's lateness, but Father ended the visit early. Despite the issues at the start of the visit, Victoria did not want it to end. Father expressed concern that Mother was alienating Victoria from him and reported that he needed to leave for a class, so the visit was terminated.

At the next visit, Victoria became irritated by Father's questions about school and wanted to play games. Her attitude improved when Father eventually played a game with her. Father made a statement afterward that the visit was better but that he "felt 'cognitive[ly] distant' from [Victoria]."

Father's first and fourth scheduled visits with Victoria in April 2023 were positive and engaging. Father's second scheduled visit that month was cancelled after Mother informed CFS that Victoria was sick and taking medication. Father requested that the social worker call Victoria's school to verify, stating that it was "'a reasonable question to pose.'" Father was late for the third scheduled visit that month and reported that he was unable to enter CFS's office. When he arrived, he was extremely upset that paternal grandparents were in the parking lot. During the visit, Father requested that CFS ask paternal grandmother to leave. Paternal grandmother reported that she came to the office to give Mother some items. Father remained quiet and distant during the visit and left early.

7

The first visit in May 2023 began well, but Victoria was upset because she wanted to play a game. She told Father that she did not want to be with him and that she did not want to be his daughter, accusing Father of lying about Mother. Victoria asked the social worker to end the visit early, because she did not want to see Father anymore. Father blamed the social worker for Victoria's behavior. The social worker assessed that Father had ignored Victoria's request to play games, which caused her to act out.

Victoria was initially hesitant to attend the next visit in May 2023. She told the social worker that she was scared and did not want to go in, but she eventually agreed. She accused Father of hitting her with a belt in the past, and Father told her to "'stop lying.'" Father asked to speak to the social worker outside of the visitation room and stated that Victoria was being "'coached'" by Mother. The visit went well following the break, and Victoria and Father hugged at the end.

That month, Father's individual therapist reported that Father had "not made any significant progress." Father "tends to blame the focus on the [Mother's] behavior and poor parenting styles and has difficulty reflecting on his own ineffective parenting styles." Father completely ignored the paternal grandparents' demand that he move out of their home, and he "[did] not recognize the conflict between him and his parents [had] caused an unsafe living environment for the children." Father lacked insight into his role in Victoria's removal and blamed others for his parenting issues. Father's counselor recommended an additional eight sessions of individual counseling with a different provider. Father's family therapist also reported that Father refused to talk to Mother

8

after she arrived late to family therapy sessions.  Father completed and received certificates for domestic violence counseling and a parenting course.

At the contested jurisdiction and disposition hearings in May 2023, the juvenile court found that Father had engaged in domestic violence with paternal grandparents and that Mother should have known about it, which placed Victoria at risk of abuse or neglect.  The court removed Victoria from Father's physical custody, placed her with Mother, and ordered that both parents would continue to hold Victoria's educational rights.  The court ordered enhancement services for Father and set a review hearing six months later.

III.     *Welfare and Institutions Code section 364 hearing*

Approximately two weeks later, Father's visit with Victoria ended early.  The social worker approached Father, but Father refused to talk and later accused CFS of failing to address his concerns regarding Mother's "'erratic behavior.'"  Father also accused Mother of "parental alienation" and demanded that CFS address his concerns.  When the social worker sent a text message to Father to schedule a meeting, Father replied "'stop sending me frivolous messages,'" accusing the social worker of having difficulties with "'boundaries and respect.'"  Father refused to communicate further with CFS until the social worker's supervisor returned from vacation.

Father and Victoria's next visit began well.  Victoria had a conversation with Father as she sat on his lap, but the visitation monitor was unable to hear what was being said.  Victoria began crying, pushed Father away, and stated that she wanted the visit to

9

end and wanted leave.  Father grew upset and "'storm[ed]'" out of the visitation room.  Victoria, the visitation monitor, and the social worker attempted to continue the visit, but Father refused, accusing CFS of alienating him from Victoria.

At the following visit, Father and Victoria ignored each other.  Before the visit was scheduled to end, Father grabbed his belongings and walked out of the office.

In July 2023, Father's first visit with Victoria began well.  Both were smiling, hugging, and having fun.  Victoria grew upset after Father began asking her questions.  Victoria went to the restroom and did not want to return, stating that she wanted the visit to end.  Without looking at Father, Victoria went back inside the visitation room, grabbed her belongings, and ended the visit.

Father's visit with Victoria the following week started well as they played together.  Father began asking Victoria questions, but she wanted to play.  She suggested ending the visit but agreed to continue after the social worker suggested that she visit a "a little longer."  Victoria cried as she hugged and kissed Father as the visit ended.  CFS reported that the visit was better than previous visits and observed that Father was able to read Victoria's cues to play and stopped questioning her when she stopped responding to him.  Mother later reported that Victoria was upset after family therapy following the visit, because Father had accused her of lying.  Victoria wanted to cancel the next visit, but Mother encouraged her to go.

At their visit the following week, Father and Victoria played with his phone, and the social worker asked him about the phone.  Father got upset, left the visitation room,

10

and requested a supervisor, and Victoria stated that Father was recording. A supervisor monitored the rest of the visit. Victoria wanted to play, and Father wanted to discuss issues with the visit, which prompted Victoria to request to end the visit, stating that she did not feel safe.

Victoria began individual therapy for issues including impulsivity, self-control, and focus. CFS received a progress report from the family therapist in August 2023. The therapist reported that the family attends therapy every week, and they appear to comprehend the information that they receive. Victoria stated that paternal grandparents had told her to report that she was afraid of Father, but she explained that she was "not really afraid of her dad." Victoria stated that Mother wanted to reunite with Father but that Father needed to approach Mother. The therapist discouraged Victoria's involvement in the parents' relationship and requested additional sessions to "rebuild the trust and bond between the dad and the child."

Father's first visit with Victoria in August 2023 went well, and there were no issues or concerns. At the next visit, Father was agitated that Victoria did not want to talk, so he played games with her instead. Victoria got upset when Father teased her, which upset Father. He sat and ignored Victoria for approximately 20 minutes, and then he insisted that Victoria apologize to him. Father told Victoria that they were "in this mess because [she] didn't tell the truth." Both Father and Victoria were visibly angry at the end of the visit, and Victoria commented to the social worker that she was glad that it was over.

The next scheduled visit was canceled after Father did not show up within the 15-minute grace period. He texted the social worker and said that he was having "'car troubles.'" Father later left a voicemail stating that he felt disrespected and that CFS was attempting to make him look like a "'deadbeat dad.'"

The first visit in September 2023 began well. When Father and Victoria began to discuss an incident at school, he became concerned by her lack of responsiveness, and he continued asking her questions. Victoria shared that she was being "'bullied at school,'" and Father encouraged her to tell her therapist about it. They later played video games together and hugged at the end of the visit.

The following visit began with games and talking, and Victoria played on an iPad. Victoria said that she was tired, and she covered herself with a jacket and did not want Father to comfort her. Father asked Victoria questions and commented about her behavior. He asked if she had been told to be disrespectful to him, which she denied. She sat in a playhouse and would not come out. Father pulled her out and then grew defensive after the social worker told him that the visit would end shortly. Victoria stood by the door and refused to finish the last few minutes of the visit. As Father attempted to discuss Victoria's behavior with the social worker, Victoria turned toward Father and said "'stop recording.'"

During one visit in October 2023, Victoria said that she wanted to live with Mother and have only supervised visitation with Father.

CFS reported that Mother had been respectful and forthcoming with information during the review period. Mother reported that she does not communicate with Father and that it is difficult to parent with him. Mother stated that she wanted to coparent effectively, because Father would always be a part of Victoria's life.

CFS reported that Father lacked insight into the reasons behind CFS's involvement. Father had not resolved the issues with paternal grandparents and continued to live in their home. He routinely questioned Victoria at visits and failed to recognize her cues to play games. Father accused Mother of alienation when she arrived late for visits. CFS assessed that Father had not benefited from services, return of Victoria to Father's custody would be detrimental, Victoria was safe in Mother's care without need of further court supervision, and dependency jurisdiction should be terminated.

At the six-month review hearing in November 2023, Father's counsel argued that Mother had been alienating Victoria from Father. Father sought custody of Victoria or, in the alternative, unsupervised visitation, because he had completed his services. Victoria's counsel argued in support of CFS's recommendation, pointing to Father's issues with visitation and his failure to progress in individual therapy.

The juvenile court found that Mother had completed her case plan but Father had not. The court found that returning Victoria to Father "would create a substantial risk of detriment to her physical and emotional well-being." The court terminated jurisdiction

with a custody order granting sole legal custody and sole physical custody to Mother and weekly monitored visitation for Father.

## DISCUSSION

Father argues that the juvenile court abused its discretion by ordering that Mother have sole physical and sole legal custody of Victoria. In the alternative, Father argues that the court abused its discretion by ordering that Father's visits remain supervised. We disagree.

We review a juvenile court's custody and visitation orders for abuse of discretion. (*In re J.M.* (2023) 89 Cal.App.5th 95, 113 (*J.M.*).) "A court abuses its discretion only when ""'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.'"" (*In re Caden C.* (2021) 11 Cal.5th 614, 641.) A finding that return of a child to a parent's custody would create a substantial risk of detriment is reviewed for substantial evidence. (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1424.)

Father's argument that the juvenile court abused its discretion by ordering that Mother have sole physical custody fails, because substantial evidence supports the juvenile court's finding that returning Victoria to Father's physical custody would create a substantial risk of detriment. Victoria was removed because of the domestic violence between Father and paternal grandparents. Father never addressed that issue. As of May 2023, Father's therapist reported that Father "lack[ed] progress" and had not resolved the conflict with paternal grandparents. His therapist reported that Father "refuses to relocate

14

from the paternal [grandparents'] home, despite [their] requests." Father's therapist also expressed that the conflict places Victoria in a "stressful and unsafe" living environment and that Father has "poor insight" into the reasons for CFS's involvement. Six months later, Father continued to live with paternal grandparents and had not resolved the issues that led to Victoria's removal. Substantial evidence therefore supports the juvenile court's finding that returning Victoria to Father's physical custody would create a substantial risk of detriment to Victoria. Accordingly, it was not an abuse of discretion for the court to order that Mother have sole physical custody.

Father's argument to the contrary is unavailing. Father points out that Victoria said that she was happy living with him when paternal grandmother left him alone and that Victoria denied that he hit or slapped her. Father also notes that many of his visits with Victoria were positive, that he completed a parenting course, a domestic violence program, and individual counseling, and that he participated in family therapy with Victoria. He concludes that Victoria would be in no danger if he shared physical custody of Victoria with Mother, and he contends that joint physical custody would be in Victoria's best interests. The argument lacks merit for two reasons. First, although Father completed various programs, the record contains ample evidence that he failed to benefit from them. Father's argument that Victoria should have been returned to his physical custody because he had completed his programs is therefore unsound. (*Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1748.) Second, the existence of contrary evidence does not show that the juvenile court's finding was not supported by

15

substantial evidence. (*People v. Cardenas* (2020) 53 Cal.App.5th 102, 119, fn. 11.) As already explained, the record contains substantial evidence supporting the court's finding that returning Victoria to Father's physical custody would create a substantial risk of detriment to her.

Father also argues that the juvenile court abused its discretion by ordering that Mother have sole legal custody. Father points out that at the disposition hearing, the court found that it was in Victoria's best interests for both Father and Mother to hold Victoria's educational rights. Father argues that "nothing happened" after disposition that would support a contrary finding.

We perceive no abuse of discretion. Throughout the pendency of the case, Father's relationship with Mother continued to be conflicted. He accused her of alienating Victoria from him, he distrusted her about her claim that Victoria was sick when Mother had to cancel a visit, and he accused Mother of being erratic. Father's therapist reported that Father and Mother do not talk and that Father "tends to blame and focus on [his children's] mothers' behaviors and poor parenting styles and has difficulty reflecting on his own ineffective parenting style." All of that evidence showed that Father was unable to cooperate with Mother when making decisions regarding Victoria. It was therefore reasonable for the court to conclude that conflict between Father and Mother would continue after jurisdiction was terminated, that the parents would therefore be unable to coparent effectively, and that granting Mother sole legal custody was consequently appropriate. The court's ruling was not arbitrary or capricious.

Regarding visitation, Father argues that the court abused its discretion by ordering that Father's visits remain supervised. For the reasons already given, however, the juvenile court reasonably concluded that supervised visitation was in Victoria's best interests. Father had not made substantial progress in addressing the issues that led to Victoria's removal, and throughout the case his visits were frequently problematic. Moreover, if Father's visits were unsupervised, he would be able to bring Victoria to the home he continued to share with his parents, which the court had found was not safe for Victoria. For all of these reasons, the juvenile court did not abuse its discretion when it ordered that Father's visitation with Victoria be supervised.

DISPOSITION

The orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

McKINSTER
Acting P. J.

CODRINGTON
J.

17